E. MARTIN ESTRADA
United States Attorney
ANNAMARTINE SALICK
Assistant United States Attorney
Chief, National Security Division
DAVID C. LACHMAN (Cal. Bar No. 261711)
NISHA CHANDRAN (Cal. Bar No. 325345)
Assistant United States Attorneys
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-5564/2429
    Facsimile: (213) 894-2927
    E-mail:    david.lachman@usdoj.gov
             nisha.chandran@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>          v.<br><br>NATALIE LE DEMOLA et al.,<br><br>       Defendants. | No. CR 22-CR-00205-JFW-1<br><br>GOVERNMENT'S SENTENCING POSITION REGARDING DEFENDANT NATALIE LE DEMOLA<br><br>Sentencing<br>Hearing Date: July 10, 2023<br>Hearing Time: 8:00 a.m.<br>Location:   Courtroom of the Honorable John F. Walter |

    Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys David C. Lachman and Nisha Chandran, hereby files its sentencing position for defendant NATALIE LE DEMOLA.

    This sentencing position is based upon the attached memorandum of points and authorities, the files and records in this case, the United States Probation and Pretrial Services Office's presentence

//

investigation report, and such further evidence and argument as the Court may permit.

Dated: June 28, 2023              Respectfully submitted,

                                  E. MARTIN ESTRADA
                                  United States Attorney

                                  ANNAMARTINE SALICK
                                  Assistant United States Attorney
                                  Chief, National Security Division


                                  _____/s/_____
                                  DAVID C. LACHMAN
                                  NISHA CHANDRAN
                                  Assistant United States Attorneys

                                  Attorneys for Plaintiff
                                  UNITED STATES OF AMERICA

## TABLE OF CONTENTS

I.    INTRODUCTION...................................................1

II.   DEFENDANT LED AND ORCHESTRATED A BRAZEN EDD FRAUD SCHEME.......3

III.  THE USPPO'S CALCULATIONS......................................6

      A.    The Government Concurs with the USPPO's Criminal
            History Calculations and the Guidelines Base Offense
            Level...................................................6

      B.    The Government Concurs with the PSR's 16-Level Loss
            Enhancement.............................................7

      C.    The Court Should Reject Defendant's Argument that
            Schemes that Defraud the Public Are Less Harmful........9

      D.    The Government Concurs with the PSR's 2-Level Increase
            Because the Scheme Involved 10 or More Victims..........9

      E.    The Government Disagrees with the PSR's Two-Level
            Increase Because the Scheme Used Means of
            Identification to Obtain Means of Identification.......11

      F.    A Four-Level Increase Applies to Defendant's
            Guidelines Offense Level Because Defendant was a
            Leader Within the EDD Fraud Scheme....................12

      G.    Joint and Several Restitution Obligation..............15

IV.   THE GOVERNMENT RECOMMENDS 102 MONTHS' INCARCERATION..........15

      A.    Need to Afford Adequate Deterrence....................15

      B.    Seriousness of the Offense............................17

      C.    Need to Avoid Unwarranted Disparities.................18

V.    CONCLUSION..................................................18

**TABLE OF AUTHORITIES**

**CASES**

Gall v. United States,
        552 U.S. 38 (2007)...........................................21

United States v. Anderson,
        532 F. App'x 373 (4th Cir. 2013)...........................13

United States v. Avila,
        95 F.3d 887 (9th Cir. 1996)............................15, 17

United States v. Edwards,
        595 F.3d 1004 (9th Cir. 2010)...............................19

United States v. Gagarin,
        950 F.3d 596 (9th Cir. 2020)...........................15, 16

United States v. Hoffman,
        901 F.3d 523 (5th Cir. 2018)................................10

United States v. Ingham,
        486 F.3d 1068 (9th Cir. 2007)..........................15, 17

United States v. Martin,
        455 F.3d 1227 (11th Cir. 2006)..............................18

United States v. Ovsepian,
        674 F. App'x 712 (9th Cir. 2017)............................12

United States v. Smith,
        751 F.3d 107 (3d Cir. 2014).................................13

United States v. Treadwell,
        593 F.3d 990 (9th Cir. 2010)................................21

**STATUTES**

18 U.S.C. § 1028A.......................................5, 13, 15

18 U.S.C. § 1344..........................................5, 7

18 U.S.C. § 1349.......................................5, 7, 9

18 U.S.C. § 3553......................................6, 19, 21

**OTHER AUTHORITIES**

Francesca R. Jensensius & Abby K. Wood, Caught in the Act but
        Not Punished: On Elite Rule of Law and Deterrence, 4 Penn.
        State J.L. & Int'l Affairs 686, 688 (2016)...................21

Stephanos Bibas, White-Collar Plea Bargaining and Sentencing
        After Booker, 47 Wm. & Mary L. Rev. 721, 724 (2005)...........19

ii

**SENTENCING GUIDELINES**

U.S.S.G. § 2B1.1...............................................*passim*

U.S.S.G. § 2B1.6...............................................14, 15

U.S.S.G. § 3B1.1...............................................15, 16, 18

U.S.S.G. § 3E1.1...............................................10, 18

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**I.   INTRODUCTION**

3      Beginning in June 2020, defendant NATALIE LE DEMOLA

4  ("defendant") led and organized from prison a large-scale scheme to

5  fraudulently obtain Pandemic Unemployment Assistance benefits

6  intended for residences of California who were unemployed because of

7  the COVID-19 pandemic.  Defendant and her co-conspirators procured

8  personal identifying information ("PII") of individuals who were

9  ineligible for unemployment insurance benefits, typically because

10  they were incarcerated.  Defendant and her co-conspirators used that

11  information to submit fraudulent online applications to the

12  California Employment Development Department ("EDD") for pandemic

13  benefits, causing EDD to disburse approximately $1.7 million in

14  pandemic benefits to EDD debit accounts.  Defendant then shared

15  information to access the EDD accounts and her co-conspirators

16  assumed the identities of more than 150 victims to withdraw hundreds

17  of thousands of dollars in pandemic benefits from ATMs in Los Angeles

18  County.  On March 7, 2023, defendant pleaded guilty without a plea

19  agreement to conspiracy to commit wire fraud and bank fraud in

20  violation of 18 U.S.C. § 1349 (count one), bank fraud in violation of

21  18 U.S.C. § 1344(2) (counts three, four, and seven), and aggravated

22  identity theft in violation of 18 U.S.C. § 1028A (count thirty-

23  three).  The parties filed a Joint Statement Regarding Defendant's

24  Rule 11 Plea on March 6, 2023 (Dkt. 321).

25      The United States Probation and Presentence Office ("USPPO")

26  issued its Presentence Report ("PSR") and Recommendation Letter

27  ("Rec. Letter") on June 5, 2023.  (Dkts. 450, 451.)  The PSR

28  calculated a total offense level of 24, which included a sixteen-

level increase because the loss attributable to defendant was greater than $1,500,000 but less than $3,500,000, a two-level increase because the scheme involved ten or more victims, a two-level increase because the offense involved the use of means of identification to obtain other means of identification, and a three-level reduction for defendant's acceptance of responsibility.  (PSR ¶¶ 50-67.)  The PSR did not include an increase for defendant's aggravating role in the offense.  (PSR ¶¶ 57-61.)  Based on a total offense level of 24, and a Criminal History Category of III, the PSR calculated an advisory Guideline range of 63 to 78 months' incarceration.  (PSR ¶ 131.)  The PSR did not identify any factors that would warrant a departure from the applicable Guidelines range, but noted that the history and characteristics of the defendant may warrant a variance.  (PSR ¶¶ 152-153.)  The USPPO recommended a sentence of 65 months' imprisonment, followed by a three-year term of supervised release. (Rec. Letter at 2-3.)  The USPPO also calculated that the reasonably foreseeable intended loss is $1,699,975 and the actual loss to EDD was $933,181.  (PSR ¶ 51.)

Defendant's criminal conduct was more than a series of bad decisions.  She led and organized a scheme that defrauded taxpayers of millions of dollars in EDD funds while serving a life sentence in for murder, aided by a contraband phone and with the assistance of a California Department of Corrections ("CDCR") employee.  All of the relevant sentencing factors articulated in 18 U.S.C. § 3553 favor a significant sentence for such a dedicated criminal.

The government agrees with the PSR's criminal history calculation and the base offense level calculation.  However, the government believes that the two-level increase imposed because the

offense involved the use of means of identification to obtain other means of identification should not apply, and believes that a four-level increase should apply based on defendant's aggravating role as an organizer or leader of the EDD fraud scheme.  In light of this, the total offense level calculation increases to 26 and the resulting advisory Guidelines range is 78 to 97 months (plus a two-year mandatory consecutive sentence on Count Thirty-Three).  Thus, the government respectfully requests that the Court sentence defendant to: (1) a Guidelines term of 102 months' imprisonment (including the two-year mandatory consecutive sentence on Count thirty-three); (2) five years of supervised release; (3) restitution in the amount of $933,181 (jointly and severally liable with all co-defendants); and (4) a mandatory special assessment of $500.

## II. DEFENDANT LED AND ORCHESTRATED A BRAZEN EDD FRAUD SCHEME

By now, the salient facts of the case are no doubt well known to the Court.  As defendant admitted at her change of plea hearing (Rule 11 Joint Statement ¶ 13):

Beginning no later than June 2020, and continuing through at least in or about April 2021, in Los Angeles County and elsewhere, defendant conspired with co-defendant Carleisha Plummer ("Plummer") and others known and unknown to commit wire fraud, in violation of 18 U.S.C. § 1349, and bank fraud, in violation of 18 U.S.C. § 1344(2). Defendant participated in the conspiracy from at least June 2020 until at least September 2020.

In furtherance of this scheme, and to accomplish its objectives, defendant used PII belonging to other people to fraudulently acquire unemployment insurance benefits from EDD, including Pandemic Unemployment Assistance benefits for residents of California who were

unemployed because of the Covid-19 pandemic ("pandemic benefits").

Specifically, defendant and her co-conspirators would obtain the PII,

such as the names, dates of birth, and social security numbers, of

other individuals who were ineligible for unemployment insurance

benefits, including pandemic benefits.  Many of the PII pertained to

individuals who were incarcerated at CDCR institutions.  Defendant

and her co-conspirators then electronically submitted fraudulent

online applications to EDD for pandemic benefits using these

individuals' PII. On the fraudulent applications, defendant and her

co-conspirators often assumed the victims' identities and provided

materially false information to EDD, including that the applicants

were unemployed as a direct result of the Covid-19 pandemic.

For example, defendant obtained the PII of CDCR inmates D.F. and

M.D.S. and then submitted applications to EDD using their PII.  D.F.

did not authorize defendant to apply for pandemic benefits using her

PII while M.D.S. incorrectly believed that defendant would provide

him a portion of any pandemic benefits obtained using his PII.

Defendant also submitted an application to EDD in her own name

despite knowing that she was ineligible for pandemic benefits because

she was incarcerated.  By submitting the fraudulent EDD applications,

defendant and her co-conspirators caused EDD to transmit emails to

email addresses they provided, and to authorize pandemic benefits to

be provided to individuals who were ineligible for pandemic benefits.

After EDD approved the fraudulent applications and disbursed the

pandemic benefits funds to the EDD debit accounts, and Bank of

America issued the EDD debit cards linked to those accounts,

defendant's co-conspirators used the EDD debit cards to make

fraudulent cash withdrawals of pandemic benefits from automated

teller machines ("ATMs") in Los Angeles County and elsewhere, including at ATMs operated by Bank of America and other financial institutions.

For example, on July 10, 2020, defendant and her co-schemers, each aiding and abetting one another, caused the withdrawal of $1,000 using an EDD debit card issued in the name of M.D.S at a Bank of America ATM in Wilmington, California. The next day, July 11, 2020, defendant and her co-schemers, each aiding and abetting one another, likewise caused the withdrawal of $1,000 using an EDD debit card issued in the name of D.F. at a Bank of America ATM in Wilmington, California. Four days later, on July 15, 2020, defendant and her co-schemers, each aiding and abetting one another, caused the withdrawal of another $1,000 using an EDD debit card in the name of D.F. at a Bank of America ATM in Wilmington, California. Each of these withdrawals occurred at an ATM operated by Bank of America and drew on funds held in Bank of America debit accounts. Defendant and her co-schemers knew that they were not entitled to these cash withdrawals.

Additionally, beginning on or about June 23, 2020, and continuing until on or about July 18, 2020, in Los Angeles and San Bernardino Counties, within the Central District of California, and elsewhere, defendant knowingly transferred, possessed, and used, without lawful authority, means of identification that defendant knew belonged to other real persons, namely, the names and EDD account numbers of M.D.S. and D.F. during and in relation to the conspiracy to commit wire fraud and bank fraud in violation of 18 U.S.C. § 1349, as charged in count one of the indictment.

## III. THE USPPO'S CALCULATIONS

### A. The Government Concurs with the USPPO's Criminal History Calculations and the Guidelines Base Offense Level.

Based on defendant's first-degree murder conviction, with enhancements for inflicting torture and lying-in-wait, for killing her mother, the USPPO determined that defendant has three criminal history points. (PSR ¶ 73.) Defendant also committed the instant offense while serving a prison sentence, increasing defendant's total criminal history score to five. (PSR ¶ 75.) Defendant thus falls within Criminal History Category III. (PSR ¶ 76.) The government concurs with this calculation.

The PSR also calculated, based on the above facts, a total offense level of 24. (PSR ¶ 67.) The government concurs with the base offense level of 7 calculated by the PSR. (PSR ¶ 67.) The PSR's total offense level calculation is as follows:

| | | |
|---|---|---|
| Base Offense Level: | 7 | U.S.S.G. § 2B1.1(a)(1) |
| $1,500,000 < Loss Amount < $3,500,000: | +16 | U.S.S.G. § 2B1.1(b)(1)(G) |
| 10 or More Victims: | +2 | U.S.S.G. § 2B1.1(b)(2)(A) |
| Use of Means of Identification to Obtain Means of Identification: | +2 | U.S.S.G. § 2B1.1(b)(11)(C)(i) |
| Acceptance of Responsibility: | -3 | U.S.S.G. § 3E1.1(a)-(b) |
| TOTAL: | 24 | |

Based on that calculation, the USPPO recognized that a total offense level of 24 and a Criminal History Category of III yield an advisory Guidelines range of 63 to 78 months' imprisonment, followed

6

by a two-year mandatory consecutive sentence, and period of supervised release of two to five years on counts one, three, four, and seven, which are Class B felonies, and one year on count thirty-three, a Class E Felony.  (PSR ¶¶ 134-138.)

**B.    The Government Concurs with the PSR's 16-Level Loss Enhancement.**

The U.S.S.G. § 2B1.1(b)(1) enhancement is intended to reflect defendant's culpability, based on "the greater of actual loss or intended loss."  U.S.S.G. § 2B1.1, App. Note 3.  "Intended loss" refers to the pecuniary harm that defendant purposely sought to inflict and includes the intended harm even if "that would have been impossible or unlikely to occur."  Id.  The reason for using intended loss is that it is a "direct measure of culpable mental state" and reflects the defendant's culpability.  United States v. Hoffman, 901 F.3d 523, 558 (5th Cir. 2018) (citations omitted) (explaining that "a focus on intended loss makes sense for moral and utilitarian considerations" (cleaned up)).  Consistent with this principle, the 16-level enhancement here appropriately captures the culpability of defendant's mens rea and, in turn, the commensurate seriousness of her crime when a defendant like this one threatens and intends the loss of over $1.7 million in losses to government assistance programs.

Here, it is evident that the intent of defendant's crimes was to fully convert all of the unemployment assistance funds fraudulently obtained from California EDD for her and her co-conspirators' use. For example, defendant admits that she obtained the PII of D.F. and M.D.S., who were incarcerated, and that she submitted applications to EDD with the PII of D.F. and M.D.S.  (Rule 11 Statement ¶ 13.)

7

Defendant then transmitted the information required to access the D.F. and M.D.S. accounts to co-defendant Plummer twice, instructing her to "call and change pin" for the D.F. and M.D.S. accounts, and to "cert" [to recertify eligibility] for the D.F. account.  (PSR ¶ 35.) As a result of defendant's actions and her directions to co-conspirators, EDD loaded $13,392 on the D.F. account.  Defendant's co-conspirators withdrew $13,387.99 from the D.F. account. Similarly, as a result of defendant's actions, EDD loaded $12,392 on the M.D.S. account.  Defendant's co-conspirators withdrew $12,389.69 from the M.D.S. account.  In other words, for these two easily traceable accounts, defendant and her co-conspirators left less than $5 on each account.  Defendant intended for and instructed her co-conspirators to be able to drain all of the funds obtained from California EDD.[1]  Thus, the intended loss amount of $1.7 million, which EDD loaded onto the fraudulent EDD accounts, is the most accurate measure of loss and defendant's culpability.  See U.S.S.G. §

---

[1] This intent to drain full accounts is seen throughout the EDD accounts used in the fraud scheme.  In response to the Court's questions at the June 26, 2023 sentencing hearings, the government conducted further inquiry into the actual and intended loss amounts in the case.

Late on June 26, 2023, the government received a revised loss calculation and learned that several previously produced documents summarizing the loss on individual EDD accounts were improperly formatted and had not, in fact, been included in the government's summary charts.

Based on this revised analysis, EDD loaded $1,699,975 onto the EDD accounts created by defendant and her co-defendants, and a total of $1,563,668.03 was withdrawn or accessed from the EDD debit card accounts.  Because this revised actual loss amount was not included in the government's summary charts produced before any defendant pleaded guilty, the government maintains that the appropriate restitution amount is $933,181.  However, because the corrected actual loss amount is $1,563,668.03, a 16-level increase is appropriate even if the Court were to rely on actual loss.

2B1.1 cmt. n.3(C) (requiring that a district court "make a reasonable estimate of the loss").

**C.  The Court Should Reject Defendant's Argument that Schemes that Defraud the Public Are Less Harmful.**

Defendant attempts to minimize the relevant loss amount, arguing that the loss here is overstated because the impact was felt by a California public assistance program, and thus California taxpayers at large, rather than an individual victim.  (Def. Obj., Dkt. 462, at 3-4.)  But defendant took advantage of a public benefit program intended to help Californians who were employed because of the global Covid-19 pandemic.  (Rule 11 Statement ¶ 13.)  The $1.7 million disbursed by EDD to this fraud scheme and the time to process its fraudulent applications were necessarily not available to other legitimate recipients in need of the funds.  A two-level variance is not appropriate.

**D.  The Government Concurs with the PSR's 2-Level Increase Because the Scheme Involved 10 or More Victims.**

The fact that defendant is being sentenced for aggravated identity theft does not preclude a two-level increase because the scheme involved ten or more victims pursuant to U.S.S.G. §2B1.1(b)(2)(A).  (Def. Obj. at 6-7.)  Defendant correctly cites to United States v. Ovsepian, 674 F. App'x 712 (9th Cir. 2017), which found that "the district court did not engage in impermissible double counting in applying a two-level enhancement for number of victims under U.S.S.G. § 2B1.1(b)(2) relating to defendant's health care fraud scheme in addition to imposing defendant's consecutive sentence for aggravated identity theft under 18 U.S.C. § 1028A.  The Ninth Circuit explained that "[t]he number-of-victims enhancement serves a

9

purpose distinct from punishing identity theft: punishing offenders based on the number of victims." Id. at 713 (citing United States v. Smith, 751 F.3d 107, 121 (3d Cir. 2014) ("Quite plainly, the victim enhancement under § 2B1.1(b)(2) is not an enhancement based on the use of a 'means of identification'; it is an enhancement based on the number of victims.")).

Defendant's argument has also been rejected by other circuits. See United States v. Anderson, 532 F. App'x 373, 378 (4th Cir. 2013) ("Like all of our sister circuits to have considered the issue, we conclude instead that § 2B1.6 does not preclude a district court from imposing a number-of-victims enhancement in conjunction with a sentence for aggravated identity theft") (collecting cases from Sixth, Tenth, Third, and Eighth Circuits). In Anderson, the Fourth Circuit explained that:

> [U.S.S.G. § 2B1.6 (Aggravated Identity Theft) cmt. n.2] instructs a district court to refrain from applying an enhancement only if it is triggered by a "specific offense characteristic for the transfer, possession, or use of a means of identification." The most natural reading of the comment limits its application to enhancements linked to the nature of the offense . . . . By contrast, the § 2B1.1(b)(2)(A) enhancement at issue here looks only to the number of victims of the offense . . . . the number-of-victims enhancement 'punishes the impact of the crime, not the transfer, possession, or use of a means of identification.'

Id. at 378-79. Defendant is being sentenced for conspiracy to commit bank and wire fraud (count one) and for bank fraud (counts three, four, and seven), which involved more than 150 victims (PSR ¶ 53), and the PSR correctly applied the two-level increase.

**E.   The Government Disagrees with the PSR's Two-Level Increase Because the Scheme Used Means of Identification to Obtain Means of Identification.**

The government agrees with the PSR's factual analysis finding that defendant and her co-conspirators used the PII (such as names, social security numbers, and dates of births) of individuals to obtain EDD-issued debit cards with account numbers linked to fraudulent applications for EDD benefits.  (PSR ¶ 55.)  The government agrees that this conduct would ordinarily support a two-level increase pursuant to U.S.S.G. § 2B1.1(b)(11)(C)(i) because the offense involved "the unauthorized transfer or use of a means of identification [i.e., names, social security numbers, and other PII] unlawfully to produce or obtain any other means of identification [i.e., EDD account numbers]."  (PSR ¶ 54; U.S.S.G. § 2B1.1(b)(11)(C)(i).)

However, the government agrees with defendant (Def. Obj. at 4) that because defendant was also convicted of count thirty-three, for aggravated identity theft, in violation of 18 U.S.C. 1028A, this two-level increase does not apply.  Application Note 2 to U.S.S.G. § 2B1.6 directs that if a sentence is imposed under § 2B1.6 for aggravated identity theft, "do not apply any specific offense characteristic for the transfer, possession, or use of a means of identification when determining the sentence for the underlying offense.  A sentence under this guideline [§ 2B1.6] accounts for this factor for the underlying offense of conviction."  Thus, the two-level increase pursuant to U.S.S.G. § 2B1.1(b)(11)(C)(i) does not apply.

11

1
2

### F.   A Four-Level Increase Applies to Defendant's Guidelines Offense Level Because Defendant was a Leader Within the EDD Fraud Scheme.

3    Defendant was an organizer or leader of the charged criminal

4 activity, which involved five or more participants or was otherwise

5 extensive, and a four-level increase applies.  U.S.S.G. § 3B1.1(a).

6 In determining whether a defendant is a leader or organizer, the

7 Court should consider the following factors: the exercise of decision

8 making authority, the nature of participation in the commission of

9 the offense, the recruitment of accomplices, the claimed right to a

10 larger share of the fruits of the crime, the degree of participation

11 in planning or organizing the offense, the nature and scope of the

12 illegal activity, and the degree of control and authority exercised

13 over others.  U.S.S.G. § 3B1.1, App. Note 4.  "[T]o sustain a finding

14 that a defendant was an organizer or a leader [under § 3B1.1(a)],

15 there must be evidence that the defendant exercised some control over

16 others involved in the commission of the offense or was responsible

17 for organizing others for the purpose of carrying out the crime."

18 United States v. Ingham, 486 F.3d 1068, 1074 (9th Cir. 2007) (citing

19 United States v. Avila, 95 F.3d 887, 890 (9th Cir. 1996)) (rejecting

20 argument that control and organizational authority are required).

21 The role enhancement does not apply if the defendant and the other

22 participants are merely "co-equal conspirators."  United States v.

23 Gagarin, 950 F.3d 596, 606 (9th Cir. 2020) (quotation omitted).

24    Defendant was not a "patsy."  (Def. Sent. Pos. at 1.)  She was

25 at the center of the EDD fraud scheme.  Defendant and her co-

26 conspirators obtained the PII that was essential to the scheme.  (PSR

27 ¶ 26.)  Specifically, defendant admitted that she, along with co-

28 conspirator Plummer, solicited PII from incarcerated CDCR inmates and

defendant herself obtained PII from a CDCR employee, who accessed the CDCR databases for this purposes.  Witnesses specifically reported watching defendant exit the CDCR employee's office with a stack of printouts with the PII.  (Id.)  Defendant's emails and recorded phone calls show that she managed and distributed to co-conspirators the usernames and passwords (including security questions) for the various EDD accounts involved in the scheme, gave directions for how to conduct the scheme (e.g., how to change addresses on EDD accounts when needed), gave directions for which EDD accounts needed to have a changed PIN number, and gave directions for where to send mail related to the scheme.  (See PSR ¶¶ 34-35.)  Defendant also clearly had organizational control over the scheme as she followed up with co-conspirators and held them accountable, saying, "I don't mean to keep reminding u, but can u please get on it and tell me what is done once u do it," listing several EDD scheme tasks.  (PSR ¶ 35.)

Additionally, and reflective of the control she exercised, scheme members viewed defendant as the leader of the scheme.  For example, one co-defendant updated defendant that he received an EDD card and then begged defendant for permission to activate it.  (PSR ¶ 36.)  Another co-defendant contacted defendant to complain that she was not receiving EDD cards and threatened to go to law enforcement. (Plea Agreement for D. Martin, Dkt. 380, ¶ 12).  In response, defendant provided the co-defendant with credentials to log into two EDD accounts, informing the co-defendant that the EDD cards had been sent to a P.O. Box where no one was able to sign for the delivery. (Id.)  Co-conspirators understood that defendant knew where the EDD cards were and that she could unlock their access to more funds.

Defendant exerted control, at a minimum, over the distribution and access to the EDD accounts, and organizational authority over the victims' PII from the CDCR employee and the fraud scheme tasks to be completed.  See Gagarin, 950 F.3d at 607 (applying a three-level aggravating role and finding significant that defendant guided others through actions to further the conspiracy, including directing the use of the bank accounts, and giving phone numbers to use as the numbers for fake insurance applications).  And defendant participated in every part of the fraud scheme that was not prevented by her incarceration.  The government submits that a four-level increase under this section is appropriate.

* * *

Accordingly, the government believes the total offense level calculation for defendant is as follows:

| | | |
|---|---|---|
| Base Offense Level: | 7 | U.S.S.G. § 2B1.1(a)(1) |
| $1,500,000 < Loss Amount < $3,500,000: | +16 | U.S.S.G. § 2B1.1(b)(1)(G) |
| 10 or More Victims: | +2 | U.S.S.G. § 2B1.1(b)(2)(A) |
| Leader or Organizer: | +4 | U.S.S.G. § 3B1.1(a) |
| Acceptance of Responsibility: | -3 | U.S.S.G. § 3E1.1(a)-(b) |
| _____ | | |
| TOTAL: | 26 | |

Based on a Criminal History Category of III, the advisory Guidelines range is 78 to 97 months' imprisonment, followed by a two-year mandatory consecutive sentence.  The government's recommended sentence is at the low-end of this advisory Guidelines range.

14

### G.   Joint and Several Restitution Obligation

The government agrees that defendant should be ordered to pay $933,181 in restitution to EDD.  (Rec. Letter at 1.)  However, in light of her leadership role in the organization, the government submits that defendant should be held jointly and severally liable with all co-defendants, to the extent that each is convicted and determined liable for losses attributable to the same fraudulently obtained benefits.  (Rec. Letter at 2.)  The victim's recovery remains limited to the amount of their loss and the defendant's liability for restitution ceases if and when the victim receives full restitution.

## IV.  THE GOVERNMENT RECOMMENDS 102 MONTHS' INCARCERATION

The government recommends that the defendant be sentenced to a Guidelines term of 102 months' imprisonment, a three-year period of supervised release, a $500 special assessment, and restitution of $933,181.  Such a sentence is sufficient, but not greater than necessary, to achieve the purposes set forth in 18 U.S.C. § 3553(a).

### A.   Need to Afford Adequate Deterrence

Economic crimes like the charged EDD scheme are quintessentially deterrable, elevating the deterrence of a significant term of imprisonment to its zenith in cases like this one.  "Because economic and fraud-based crimes are 'more rational, cool, and calculated than sudden crimes of passion or opportunity,' these crimes are 'prime candidate[s] for general deterrence.'"  See United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (quoting Stephanos Bibas, White-Collar Plea Bargaining and Sentencing After Booker, 47 Wm. & Mary L. Rev. 721, 724 (2005)).  In fact, Congress, in drafting section 3553, confirmed that this common-sense principle was one of the driving

forces for including deterrence among the goals of sentencing.  See
S. Rep. No. 98-255, at 76 (1983), reprinted in 1984 U.S.C.C.A.N.
3182, 3259 ("To deter others from committing the offense . . . is
particularly important in the area of white collar crime.").  Indeed,
Congress was expressly concerned with the fact that "[m]ajor white
collar criminals often are sentenced to . . . little or no
imprisonment," which the offenders disregard as "a cost of doing
business."  Id.  As Judge Bea has written, "bank fraud, unlike an
assault in a tavern or even domestic abuse, tends to be a planned,
deliberate crime, which allows plenty of time for reflection,
calculation of the odds of success or failure, and the ultimate
decision."  United States v. Edwards, 595 F.3d 1004, 1021 (9th Cir.
2010) (Bea, J., concurring).

Defendant's brazen EDD fraud scheme — which involved harvesting
PII belonging to other inmates, using that information to
fraudulently procure pandemic unemployment benefits, and then using a
network of accomplices to withdraw the funds, all while serving a
life sentence in California state prison — was no crime of passion or
emotional outburst.  Nor was she feeding an addiction or suffering
from mental illness.  Instead, defendant made a cost-benefit analysis
and decided that the money and influence, including among fellow
inmates, that she stood to gain was worth the additional penalties
she faced if she were caught.  For almost a year, and to the tune of
nearly $1.7 million, defendant's decision paid off.  Unless
defendant's crimes are met with an adequate punishment, others like
her – including other inmates - will undoubtedly make the same
calculation she did, and many of those will do so without ever being
apprehended.

The fact that defendant was already incarcerated on a life sentence further demonstrates the need for a sentence that affords adequate deterrence.  As a general rule, "deterrence from criminal behavior is a function of the probability of detection, the size of the sanction, and the benefit that the would-be violator stands to gain if not detected."  Francesca R. Jensensius & Abby K. Wood, Caught in the Act but Not Punished: On Elite Rule of Law and Deterrence, 4 Penn. State J.L. & Int'l Affairs 686, 688 (2016). Defendant led and organized a scheme in which she and her co-conspirators pocketed hundreds of thousands of dollars allocated for residents of California who were unemployed on account of the COVID-19 pandemic.  The severity of defendant's sentence must therefore reflect not only the seriousness of her conduct but the need to deter inmates from committing crimes and the difficulty inherent in detecting, apprehending, and convicting fraudsters who seek to abuse public benefits programs.

**B.   Seriousness of the Offense**

This is a case in which the sentencing guidelines appropriately identify the factors that make defendant's conduct so serious: the $1.7 million in intended losses, the number of individuals whose identities she obtained or corruptly procured with the assistance of a CDCR employee, hers and others' connections with the Hoover Crips street gang (the same gang that also contributed to defendant's murder of her mother), and defendant's role as its principal organizer.  Together, these factors speak to a sophisticated criminal whose conduct calls for a substantial criminal sentence.

While the seriousness of defendant's conduct speaks for itself, several other factors demonstrate the need for defendant's sentence

17

1  to sufficiently "provide just punishment."  18 U.S.C.

2  § 3553(a)(2)(A).  First, defendant's crime was no momentary lapse in

3  judgment.  It was rather a lifestyle, his sole identifiable source of

4  income for years.  Likewise, just as defendant's offense is more

5  susceptible to deterrence because it arose from a calculated cost-

6  benefit analysis, so too it is all the more serious, since it was the

7  product of a series of deliberate choices.  Finally, that she is one

8  of the scheme's two most culpable members – its ringleader and

9  organizer – demonstrates her contempt for the law.

10       **C.   Need to Avoid Unwarranted Disparities**

11       Section 3553(a)(6) requires the Court to minimize sentencing

12  disparities among similarly situated defendants.  One way of doing so

13  is to correctly calculate the Guidelines range and then sentence

14  defendants within that range.  See United States v. Treadwell, 593

15  F.3d 990, 1011 (9th Cir. 2010) ("Because the Guidelines range was

16  correctly calculated, the district court was entitled to rely on the

17  Guidelines range in determining that there was no 'unwarranted

18  disparity' . . . ."); Gall v. United States, 552 U.S. 38, 54 (2007)

19  ("[A]voidance of unwarranted disparities was clearly considered by

20  the Sentencing Commission when setting the Guidelines ranges.").  The

21  government's within-Guidelines recommended sentence avoids an

22  unwarranted disparity with similarly situated defendants.

23  **V.   CONCLUSION**

24       For the foregoing reasons, the government recommends that the

25  Court sentence defendant to 102 months' imprisonment (including a

26  mandatory 24-month consecutive sentence), three years' supervised

27  release, a $500 special assessment, and restitution of $933,181.

28